UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROBERT G. CARD,

              Petitioner,                    CASE NO. 4:24-CV-12452

v.                                    HON. F. KAY BEHM
                                          U. S. District Judge

KIM CARGOR,

              Respondent.

_____/

**OPINION AND ORDER DISMISSING THE PETITION FOR
A WRIT OF HABEAS CORPUS, DECLINING TO ISSUE
A CERTIFICATE OF APPEALABILITY, AND GRANTING
LEAVE TO APPEAL *IN FORMA PAUPERIS***

Robert G. Card, ("Petitioner"), incarcerated at the Cotton Correctional Facility in Jackson, Michigan, filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, through counsel Robert J. Dunn.  Petitioner challenges his conviction for second-degree murder, Mich. Comp. Laws § 750.317, and being a fourth felony habitual offender, Mich. Comp. Laws § 769.12. For the reasons that follow, the petition is DISMISSED WITH PREJUDICE.

**I.  Background**

Petitioner was convicted following a jury trial in the St. Clair County Circuit Court. The material facts from Petitioner's conviction are gleaned from the Michigan Court of Appeals' opinion affirming Petitioner's conviction on his appeal of right, *see People v. Card*, No. 340550, 2023 WL 4144851, at *1–4 (Mich. Ct. App. June

1

22, 2023), *lv. den.* 513 Mich. 1046, 3 N.W.3d 801 (2024), which is presumed correct on habeas review pursuant to 28 U.S.C. § 2254(e)(1). *See Shimel v. Warren*, 838 F.3d 685, 688 (6th Cir. 2016).

The victim, John Allen, was murdered in his family home in the winter of 2014. Judy Higley-Zuehlke (Higley) lived with the victim for some time at that address, but was evicted by the victim's mother. After the victim's mother died, the victim inherited the home but did not allow Higley to live there although she regularly visited him. During the summer, the victim worked at the Black River Country Club, performing lawn maintenance services. In the winter, he removed snow for a few clients. The victim's brother, James Allen, owned a store located around the corner from the victim's home.

The victim had been doing some renovation on his home, including repairing a staircase leading to the second level. Mark McDougal, the victim's boss, agreed to help the victim. On Saturday, January 25, 2014, McDougal and his wife ran into the victim and Higley at a home construction store. McDougal suggested that the victim purchase lumber from a different store that would cut the wood to specific measurements. On January 29, 2014, McDougal and Higley met at the victim's house. McDougal sat at the victim's kitchen table where a cheap, lightweight, "dollar store" hammer was placed. McDougal described it as being red fiberglass with a flat

2

black paint covering part of it. This hammer was never located in the home following the victim's death.

James Allen last saw the victim on Thursday, January 30, 2014. On Friday, there was substantial snowfall in the area. About six inches of snow also fell on Saturday, February 1, 2014. The 2014 Super Bowl took place on Sunday, February 2, 2014. James received phone calls from the victim's snow-removal clients because the victim had not shoveled their snow. James attempted to call the victim but could not reach him.

On Monday, February 3, 2014, James walked over to the victim's home to check on him. The victim had not shoveled the snow by his home. When James used his key to the victim's home to open the door, he immediately smelled an odor, and saw the victim lying on the floor. James then stepped back out of the home and closed the door. On his way back to the store, James encountered the victim's neighbor, Rachelle Bradshaw, who offered to call the police.

Police found no signs of forced entry into the victim's home, but the victim suffered severe trauma, including a hole in the back of his head. A meat thermometer was found lying on a chair next to the victim's body. Police found the victim's cell phone, but were unable to retrieve text messages from it. The victim's wallet and a coin purse were not found in the home.

Rachelle Bradshaw lived with Petitioner next door to the victim in a house that had been converted into apartment units. On Fridays, Bradshaw routinely went to her son's home to babysit her granddaughter from 4:00 p.m. until midnight. On Friday, January 31, 2014, Petitioner went with Bradshaw to babysit her granddaughter.  A few hours into the evening, Bradshaw and Petitioner had an argument and Bradshaw asked Petitioner to leave.  Bradshaw testified that Petitioner behaved oddly earlier in the day. Before Bradshaw and Petitioner left to babysit Bradshaw's granddaughter, Petitioner came out of the bathroom, holding his hands and arms up and looking them over. Bradshaw was concerned by this behavior.

Bradshaw also described an odd interaction between the victim and Petitioner sometime in the middle of winter.  The victim knocked at her apartment door, and Petitioner answered it.  Bradshaw heard the victim say, "please don't hit me." She noticed that the victim was intoxicated, wore socks with no shoes, and had no coat. After speaking with Petitioner for approximately 5 minutes, the victim left to go home. Sometime after this interaction, Petitioner told Bradshaw that he was leaving to check on the victim and was gone for 5 to 10 minutes. When he returned home, Bradshaw did not notice his clothing being disheveled or stained. Bradshaw stated that she may have told the police that this interaction occurred between January 28 and January 31, 2014, but Petitioner's trial took place three years later and she could no longer recall the specific date at trial.

4

The medical examiner estimated that the victim had been dead for 3 to 5 days when his body was discovered on Monday, February 3, 2014. The victim had suffered extensive trauma, including five distinct lacerations to the scalp, one of these was associated with a skull fracture. The medical examiner opined that a small, heavy, blunt instrument, like a hammer, would have caused those wounds. There were also signs that the victim had been manually strangled with hands or even by a foot or knee. The victim also suffered several rib fractures, which likely were caused by kicks, punches, or being knocked into a solid structure. The medical examiner discovered a puncture wound involving the victim's inner ear into his brain that was caused by the purposeful and forceful insertion of a thin, rigid object. The medical examiner testified that although strangulation was the actual cause of death, contributory causes of death were the puncture wounds to the ear and skull and the multiple blunt-force head injuries. The medical examiner speculated that the blunt-force injuries probably occurred first, followed by strangulation and the ear puncture after the victim had been rendered somewhat incapacitated.

Officer Jeremy Young interviewed Petitioner on February 8, 2014. Petitioner told Officer Young that he would be able to prove his whereabouts at the time of the murder if he had not deleted all his text messages. Petitioner told the officer that he just changed his phone number the previous day, which happened to coincide with

the day the police left a message with Bradshaw that they wanted to speak with Petitioner.

In December of 2016, the police interviewed Petitioner again after his DNA was discovered on the meat thermometer left in the victim's home. In that interview, Petitioner denied being involved in the victim's murder and provided an explanation for his whereabouts on the morning of Friday, January 31, 2014. Petitioner did not remember touching a meat thermometer at the victim's house but acknowledged that he must have at some point. Petitioner admitted to selling "weed" to the victim but denied selling any crack to him or smoking any crack with him. Petitioner explained that the victim had asked about getting some powder cocaine, but Petitioner told him that he only could get crack, and the victim declined.

Forensic testing of the meat thermometer did not reveal a legible fingerprint, however, DNA from the blood on the tip portion of the thermometer matched the victim's DNA. On the edge of the thermometer dial, where a person usually grasps the thermometer to use it, there were two DNA donors: the victim and Petitioner. Higley was excluded as a donor to the DNA found on the thermometer. Although Petitioner told the police during his interviews that he had no recollection of ever seeing a meat thermometer and that, assuming the test was valid, his DNA had to have gotten on the thermometer while moving it, perhaps when looking for a screwdriver in one of the victim's drawers. At trial, a state police forensic analyst

questioned as to whether such a limited contact could leave a DNA sample on the thermometer.

Two county jail inmates, Cassandra Ross and Maureen Thorpe, testified that Higley confessed to her involvement in the victim's murder.

Thorpe testified that Higley told her that she and "JR" were lovers. Thorpe also testified that, on one occasion, when Higley returned to the jail cell, Higley was laughing and happy and saying that she had "gotten away with it." When Thorpe asked Higley if she murdered JR, she responded, "Yeah, but they can't prove it." Thorpe was also asked what Higley said in response to some questions by Ross. Thorpe testified that Higley claimed that she "got away with it" and that JR "had so much drugs and alcohol in his system and broken bones that they couldn't prove when that had happened." Thorpe denied ever searching through Higley's belongings and denied ever reading any reports related to this matter.

Ross testified that she did not know Petitioner, even though she shared a cell with Higley and Thorpe when she was in jail in April 2014. Higley told Ross that someone called "JB" had died in her case and that she was involved in a "love triangle," with JB being her boyfriend. Ross testified that one day, after Higley returned from meeting with her attorney, Higley suggested that she was being released because "they" could not prove anything. Higley explained to Ross that

there were "too many pills and stuff in his system" and too many "bumps," "bruises," and "broken bones" to prove anything.

Higley's two recorded interviews with the police were admitted into evidence at Petitioner's trial.  In the first interview, Higley alleged that she woke up Friday morning crying after having had a "terrible nightmare" that something bad had happened to the victim.  She called the victim, who did not answer the phone.  So, she went to the victim's house.  Higley told the police that she knocked on the door and when there was no answer, she left.  Higley said that after not seeing the victim, she went to a pawn shop and pawned a necklace she owned, and then went to Buscemi's for some beer before heading home.  Higley also said that she lived with her boyfriend, William "Dale" Neumann, Jr.  To conceal her contacts with the victim from Neumann, Higley had the victim's contact labeled as "Mrs. Cleary" on her phone.  Although she texted with the victim, Higley told the police that it would be "too dangerous" to retain those texts on her phone.

The police interviewed Higley two days later.  Higley again told them that she had a dream that something bad had happened to the victim. This time, Higley admitted that when she went to the victim's house around 12:30 p.m. or 1:00 p.m. on Friday, January 31, she went inside and discovered him dead on the floor, with a hole in the back of his head.  Higley indicated that the pool of blood behind his head was "steaming," as if the incident had "just happened." Higley knew that the victim

was dead, panicked, and erased the text messages from the victim's cell phone. Higley looked for a "joint" to calm her nerves. The search was unsuccessful. Higley then looked in the refrigerator for a beer. Again the search was unsuccessful. Higley left the home and locked the door, before heading to the pawn shop.

Higley was tried and convicted for the murder of the victim, but that conviction was vacated months later when it was discovered that Petitioner's DNA was present on the meat thermometer. Higley was retried and convicted again, this time with the prosecutor acknowledging Petitioner's DNA. Petitioner's trial occurred a few months after Higley's retrial concluded. Higley's convictions were affirmed on appeal. *People v. Higley-Zuehlke*, No. 337332, 2023 WL 4141075 (Mich. Ct. App. June 22, 2023), *lv. den.*, 513 Mich. 1046, 4 N.W.3d 67 (2024)

Petitioner was convicted at his trial. He was sentenced to 40-70 years in prison. As mentioned above, his conviction was affirmed on appeal.

Petitioner seeks habeas relief on the following grounds:

I. Whether the trial court erred in not holding that the prosecutor was barred from trying Defendant as the sole principal of the murder of John Allen because of collateral estoppel when a previous jury of this court twice convicted Judith Higley without participation of Robert Card of committing the exact same acts causing the victim's death contrary to clearly established U.S. Supreme Court case law in *Ashe v Swenson* and *Bravo v Fernandez [sic] v United States.*

II. Whether the Defendant's 6th Amendment right to a fair trial was violated now requiring a new trial based on the admission of highly prejudicial hearsay could not be cross-examined, was ineffective

assistance of counsel, and the state court's ruling failed to follow the clearly established U.S. Supreme Court decision in *Crawford*.

III. Whether the trial judge erred in denying trial counsel's oral motion to admit evidence of Judith Higley's second-degree murder conviction because Defendant could not fully exercise his Sixth Amendment right to present a defense of third-party guilt when Higley took the Fifth Amendment and did not testify where much stronger evidence of that guilt would have been shown by her conviction, all of which was the consequence of the Michigan courts failure to follow the clearly established U.S. Supreme Court's decision in *Chamber*, *Holmes* and *Crane*.

## II. Standard of Review

28 U.S.C. § 2254(d), as amended by The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), imposes the following standard of review for habeas cases:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–

(1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme

10

Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).  An "unreasonable application" occurs when "a state court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." *Id.* at 409.  A federal habeas court may not "issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 410-11.  "[A] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011).  To obtain habeas relief in federal court, a state prisoner is required to show that the state court's rejection of his claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.,* at 103.

### III. Discussion

#### A. Claim # 1. The collateral estoppel claim.

Petitioner first argues that the State of Michigan was collaterally estopped from prosecuting Petitioner for the murder because at co-defendant Judith Higley's first trial, the prosecutor's theory was that she killed the victim by herself with no assistance from other individuals.

11

Issue preclusion, or collateral estoppel, is a civil-law concept which indicates that "when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." *Ashe v. Swenson*, 397 U.S. 436, 443 (1970). In *Ashe*, the Supreme Court incorporated preclusion into criminal law via the Fifth Amendment's Double Jeopardy Clause and to the states via the Fourteenth Amendment's Due Process Clause. *Id.* at 445 (citing *Benton v. Maryland*, 395 U.S. 784 (1969)). In *Ashe*, the defendant was charged with armed robbery of a group of poker players and the theft of a vehicle. He was tried and acquitted. Later, the prosecution attempted to try the defendant again for the robbery of a different participant in the poker game. The Supreme Court held that this was collateral estoppel and therefore the second prosecution was barred by the Fifth Amendment guarantee against double jeopardy. *Id.* at 446-47.

The rule announced in *Ashe*, however, is of limited application in criminal cases. "The Supreme Court has found issue preclusion under *Ashe* only three other times." *Langley v. Prince*, 926 F.3d 145, 157 (5th Cir. *2019*) (citing *Turner v. Arkansas*, 407 U.S. 366, 369–70 (1972) (per curiam); *Harris v. Washington*, 404 U.S. 55, 57 (1971) (per curiam); *Simpson v. Florida*, 403 U.S. 384, 386 (1971) (per curiam)). The *Turner*, *Harris*, *Simpson*, and *Ashe* cases all involved blanket acquittals of the defendants. *Id.* None of the juries in those four Supreme Court cases

12

convicted the defendant of the charged crime. *Id.* at 158. Neither *Ashe* nor the three subsequent Supreme Court cases that relied on *Ashe* held that the principles of issue-preclusion apply to a criminal conviction. *Id.* There is thus no "clearly established Federal law, as determined by the Supreme Court," which explains whether and to what extent a state court should find issue preclusion following a defendant's conviction. *Id.* This, as the Fifth Circuit suggests, is not "surprising" considering that the Supreme Court has held that "*Ashe's* protections apply *only* to trials following *acquittals*." *Id.* (quoting *Currier v. Virginia,* 585 U.S. 493, 501 (2018)) (emphases added). Accordingly, "[A] fairminded jurist could conclude the rule clearly established in *Ashe* does not apply to a conviction rather than a general acquittal." *Id.* at 158.

Petitioner was not tried and acquitted for the victim's murder and then retried a second time under a different theory. Instead, his co-defendant was initially tried and convicted for the victim's murder under a theory by the prosecution that she had acted alone. Her conviction was vacated following the discovery of Petitioner's DNA on the meat thermometer that had been used as a murder weapon. Petitioner was then charged with this crime and tried and convicted as an aider and abettor to the murder based on his DNA and other evidence. Higley on her re-trial was tried and convicted under a theory that she had acted in concert with Petitioner to murder the victim. Petitioner has cited to no Supreme Court caselaw which suggests that a

prosecutor is collaterally estopped from pursuing a different theory of the criminal case against a defendant than the theory used to prosecute an accomplice, particularly if newly discovered evidence suggests the defendant's involvement in the crime.

Petitioner was not placed in jeopardy at Higley's first trial, thus, any results of that trial would not bind the state in its prosecution of Petitioner. *See Nichols v. Scott*, 69 F.3d 1255, 1270 (5th Cir. 1995). "Moreover, the rule of 'collateral estoppel' described in *Ashe* ....required that the two actions be between 'the same parties.'" *Id.* (quoting *Ashe*, 397 U.S. at 443). Because Petitioner was not a party in Higley's trial, the result in that trial could not collaterally estop the state in its prosecution of Petitioner even under the federal common law rule of collateral estoppel in criminal cases. *Id.*

Moreover, a prosecutor may use different strategies in different trials for accomplices without violating due process. *Burns v. Mays*, 31 F.4th 497, 506 (6th Cir. 2022); *see also Bradshaw v. Stumpf*, 545 U.S. 175, 186–87 (2005) (finding that the "Court of Appeals was also wrong to hold that prosecutorial inconsistencies between the Stumpf and [his accomplice] cases required voiding Stumpf's guilty plea"); *see also Bradshaw*, 545 U.S. at 190 (Thomas, J., concurring) ("This Court has never hinted, much less held, that the Due Process Clause prevents a State from prosecuting defendants based on inconsistent theories."); *Stumpf v. Robinson*, 722

14

F.3d 739, 750 (6th Cir. 2013) (en banc) ("The mere fact that the State argued for different inferences in different cases does not make either argument so unfair that it violates the Due Process Clause."); *Blalock v. Wilson*, 320 F. App'x 396, 417-18, and n. 26 (6th Cir. 2009) (holding that there was no "'clearly established' Supreme Court or Sixth Circuit precedent, including *Bradshaw*, that a prosecutorial strategy of taking unconstitutionally inconsistent positions in two separate trials would violate a defendant's due process rights"). Petitioner is not entitled to habeas relief on his first claim.

## B. Claim # 2. The hearsay/confrontation/ineffective assistance of counsel claims.

In his second claim, Petitioner alleges that the trial judge allowed in inadmissible hearsay testimony which violated his right to a fair trial and his Sixth Amendment right to confrontation. Alternatively, Petitioner alleges that trial counsel was ineffective for failing to object. Petitioner refers to Rachelle Bradshaw's testimony, in which she testified that as the victim stood in Bradshaw's home doorway he said to Petitioner "please don't hit me."

Petitioner initially argues that the victim's out-of-court utterance was barred by Michigan's rules of evidence. He also argues that the victim's utterance should have been excluded under M.R.E. 403 for being more prejudicial than probative.

It is "not the province of a federal habeas court to reexamine state-court determinations on state-court questions." *Estelle v. McGuire*, 502 U.S. 62, 67-68

(1991). "[S]tate and federal statutes and rules, not the Due Process Clause, ordinarily govern the admissibility of evidence in criminal trials." *Stewart v. Winn*, 967 F.3d 534, 538 (6th Cir. 2020) (citing *Perry v. New Hampshire*, 565 U.S. 228, 237 (2012)) (cleaned up). "Generally, state-court evidentiary rulings cannot rise to the level of due process violations unless they 'offend[] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quoting *Montana v. Egelhoff*, 518 U.S. 37, 43 (1996)). Further, "[t]o show a due process violation under [the] AEDPA rooted in an evidentiary ruling, this court has typically required a Supreme Court case establishing a due process right with regard to that specific kind of evidence." *Moreland v. Bradshaw*, 699 F.3d 908, 923 (6th Cir. 2012).

The Michigan Court of Appeals rejected Petitioner's claim that this was impermissible hearsay by indicating that the victim's utterance was not a statement, as defined by M.R.E. 801, but a command. *People v. Card*, 2023 WL 4144851, at *6.

The admissibility of evidence under Michigan's hearsay rules is not cognizable in a habeas corpus proceeding. *See Byrd v. Tessmer*, 82 F. App'x 147, 150 (6th Cir. 2003). What is or is not hearsay evidence in a state court trial is governed by state law. *See Johnson v. Renico*, 314 F. Supp. 2d 700, 705 (E.D. Mich. 2004) (internal citations omitted). The Michigan Court of Appeals determined that

the victim's utterance was not hearsay.  A federal habeas court is bound by a state appellate court's ruling that certain testimony is not hearsay, because state law governs questions concerning the admissibility of evidence. *Id.* at 706. The admission of this evidence in violation of Michigan's rules of evidence would not entitle Petitioner to relief.

Petitioner's claim that this evidence should have been excluded under M.R.E. 403 for being more prejudicial than probative does not entitle him to habeas relief. The Sixth Circuit found that "[t]he Supreme Court has never held (except perhaps within the capital sentencing context) that a state trial court's admission of *relevant* evidence, no matter how prejudicial, amounted to a violation of due process." *Blackmon v. Booker*, 696 F.3d 536, 551 (6th Cir. 2012) (emphasis original).  The Michigan Court of Appeals found that the victim's utterance was relevant because it showed he feared being harmed by Petitioner. *People v. Card*, 2023 WL 4144851, at * 6.  This Court must defer to that determination.

Petitioner also claims that the admission of the victim's utterance violated his Sixth Amendment right to confrontation.

Out of court statements that are testimonial in nature are barred by the Sixth Amendment Confrontation Clause unless the witness is unavailable and the defendant has had a prior opportunity to cross-examine the witness, regardless of whether such statements are deemed reliable by the court. *See Crawford v.*

*Washington,* 541 U.S. 36 (2004). However, the Confrontation Clause is not implicated, and thus does not need not be considered, when non-testimonial hearsay is at issue. *See Davis v. Washington*, 547 U. S. 813, 823-26 (2006); *see also Desai v. Booker,* 538 F.3d 424, 425-26 (6th Cir. 2008). Testimonial statements do not include remarks made to family members or acquaintances, business records, or statements made in furtherance of a conspiracy. *Crawford,* 541 U.S. at 51-52, 56. In holding that the Sixth Amendment right to confrontation does not apply to non-testimonial statements, the Supreme Court stated:

> "The text of the Confrontation Clause reflects this focus [on testimonial hearsay]. It applies to 'witnesses' against the accused-in other words, those who 'bear testimony.' 1 N. Webster, An American Dictionary of the English Language (1828). 'Testimony,' in turn, is typically 'a solemn declaration or affirmation made for the purpose of establishing or proving some fact.' *Ibid.* An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not."

*Davis,* 547 U.S. at 823-24 (quoting *Crawford,* 541 U.S., at 51).

The victim's utterance did not qualify as a testimonial statement covered by the Confrontation Clause because it was a remark made to a friend or acquaintance and not one made to law enforcement. *See Deshai,* 538 F.3d at 427. Moreover, because the Confrontation Clause has no applicability to non-testimonial statements, they may be admitted even if they lack indicia of reliability. *See Whorton v. Bockting,* 549 U.S. 406, 420 (2007). The Michigan Court of Appeals reasonably rejected this portion of Petitioner's claim.

Petitioner, however, argues that his trial counsel was ineffective for failing to object to the admission of the victim's utterance.

To the extent that Petitioner argues that counsel was ineffective for failing to object on the ground that admission of the victim's utterance violated Michigan law, he would not be entitled to relief.

Federal habeas courts "'must defer to a state court's interpretation of its own rules of evidence and procedure' when assessing a habeas petition." *Miskel v. Karnes*, 397 F.3d 446, 453 (6th Cir. 2005) (quoting *Allen v. Morris*, 845 F.2d 610, 614 (6th Cir. 1988)). Because the Michigan Court of Appeals determined that under Michigan law the victim's utterance did not qualify as hearsay evidence and was not more prejudicial than probative, this Court must defer to that determination in resolving this portion of Petitioner's ineffective assistance of counsel claim. *See Brooks v. Anderson*, 292 F. App'x 431, 437-38 (6th Cir. 2008). This Court "cannot logically grant the writ based on ineffective assistance of counsel without determining that the state court erred in its interpretation of its own law," thus this Court is constrained to reject this portion of Petitioner's ineffective assistance of trial counsel claim. *See Davis v. Straub*, 430 F.3d 281, 291 (6th Cir. 2005). Bradshaw's testimony concerning the victim's utterance did not violate the Confrontation Clause; counsel was not ineffective for failing to object to its admission on this basis.

19

*See e.g. U.S. v. Johnson,* 581 F.3d 320, 328 (6th Cir. 2009). Petitioner is not entitled to habeas relief on his second claim.

**C. Claim # 3. The right to present a defense claim.**

Petitioner next claims that he was denied the right to present a defense when the trial court refused to allow him to admit into evidence a certified copy of Higley's conviction for the murder of the victim.

Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he also has the right to present his own witnesses to establish a defense. This right is a fundamental element of the due process of law. *Washington v. Texas*, 388 U.S. 14, 19 (1967); *see also Crane v. Kentucky,* 476 U.S. 683, 690 (1986) ("whether rooted directly in the Due Process Clause of the Fourteenth Amendment, or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense'") (internal citations omitted). However, an accused in a criminal case does not have an unfettered right to offer evidence that is incompetent, privileged, or otherwise inadmissible under the standard rules of evidence. *Montana v. Egelhoff*, 518 U.S. at 42. The Supreme Court, in fact, has indicated its "traditional reluctance to impose constitutional constraints on ordinary evidentiary rulings by state trial courts." *Crane,* 476 U.S. at 689. The Supreme Court gives trial court judges "wide latitude"

to exclude evidence that is repetitive, marginally relevant, or that poses a risk of harassment, prejudice, or confusion of the issues. *Id.* (quoting *Delaware v. Van Arsdall,* 475 U.S. at 679).

Under the standard of review for habeas cases as enunciated in § 2254(d)(1), it is not enough for a habeas petitioner to show that the state trial court's decision to exclude potentially helpful evidence to the defense was erroneous or incorrect. Instead, a habeas petitioner must show that the state trial court's decision to exclude the evidence was "an objectively unreasonable application of clearly established Supreme Court precedent." *See Rockwell v. Yukins,* 341 F.3d 507, 511-12 (6th Cir. 2003).

The Michigan Court of Appeals rejected Petitioner's claim in part because Petitioner was able to introduce significant evidence implicating Higley in the victim's murder, including her interviews with and statements to the police, her admission that she previously lied about when she last saw the victim, her concession that after finding the victim dead on January 31, 2014, and that she deleted text messages from the victim's cell phone. Additionally, Petitioner also successfully offered into evidence, through the testimonies of Thorpe and Ross, that Higley expressly and implicitly confessed that she murdered the victim. *People v. Card*, 2023 WL 4144851, at *8.

21

In light of the fact that Petitioner was able to present considerable evidence that Higley murdered the victim, the trial court's refusal to permit Petitioner to introduce a copy of Higley's conviction into evidence did not deprive Petitioner of a meaningful opportunity to present a defense. *See Wynne v. Renico,* 606 F.3d 867, 871 (6th Cir. 2010) (Petitioner's Sixth Amendment right to present complete defense was not violated at murder trial by decision to exclude propensity evidence about third party where the petitioner was permitted to introduce considerable evidence that the third party was the murderer); *see also United States v. Lucas*, 357 F.3d 599 (6th Cir. 2004) (federal defendant's Sixth Amendment right to present defense was not violated at drug trial by decision to exclude evidence of absent third party's prior conviction for possessing and distributing cocaine as irrelevant, where the defendant was able to explore her theory that the third party was in fact the culprit and present it to the jury through witness testimony, as well as her own, describing the third party's alleged strange behavior and alleged access to car where drugs were found).

The trial court's exclusion of a certified copy of Higley's murder conviction from evidence was not so egregious that it effectively denied Petitioner a fair trial, in light of the fact that Petitioner was not completely barred from presenting evidence and arguing that Higley was solely responsible for the victim's murder. *See Fleming v. Metrish*, 556 F.3d 520, 535-36 (6th Cir. 2009).  With the quantum of evidence on the defense theory in the record, this Court finds that the Petitioner was

22

afforded "a meaningful opportunity to present a complete defense." *Allen v. Howes,* 599 F. Supp. 2d 857, 873 (E.D. Mich. 2009) (citing *Crane*, 476 U.S. at 690 (citation and internal quotations omitted)).  Petitioner is not entitled to habeas relief on his third claim.

## IV. Conclusion

Before Petitioner may appeal this Court's dispositive decision, a certificate of appealability must issue. *See* 28 U.S.C. § 2253(c)(1)(a); Fed. R. App. P. 22(b).  A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).  When a court rejects a habeas claim on the merits, the substantial showing threshold is met if the petitioner demonstrates that reasonable jurists would find the district court's assessment of the constitutional claim debatable or wrong. *See Slack v. McDaniel*, 529 U.S. 473, 484-85 (2000).  "The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rules Governing § 2254 Cases, Rule 11(a), 28 U.S.C. foll. § 2254.

For the reasons stated in this opinion, the Court will deny Petitioner a certificate of appealability because he has failed to make a substantial showing of the denial of a federal constitutional right. *See Dell v. Straub,* 194 F. Supp. 2d 629, 659 (E.D. Mich. 2002).  However, although jurists of reason would not debate this Court's resolution of Petitioner's claims, the issues are not frivolous; therefore, an

appeal could be taken in good faith and Petitioner may proceed *in forma pauperis* on appeal. *See Foster v. Ludwick,* 208 F. Supp. 2d 750, 765 (E.D. Mich. 2002).

### V. ORDER

Accordingly, it is **ORDERED** that the petition for a writ of habeas corpus (ECF No. 1) is **DENIED**.

It is further **ORDERED** that a certificate of appealability is **DENIED.**

Petitioner will be **GRANTED** leave to appeal *in forma pauperis.*

**SO ORDERED.**

<u>s/F. Kay Behm</u>
F. Kay Behm
Dated: June 23, 2025          United States District Judge